UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

YACOUB HANNA, d/b/a
FLEMING FOOD SHOPPE,

    Plaintiff,                                              Case No. 04-74627

v.                                                                          Hon. Gerald E. Rosen

UNITED STATES OF AMERICA,
OFFICE OF THE ATTORNEY GENERAL,
UNITED STATES ATTORNEY, and
SECRETARY OF AGRICULTURE,

    Defendants.
_____/

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     March 30, 2007

PRESENT: Honorable Gerald E. Rosen
                    United States District Judge

## I. INTRODUCTION

Plaintiff Yacoub Hanna commenced this suit in this Court in November of 2004, challenging the decision of the United States Department of Agriculture's Food and Nutrition Service ("FNS") to disqualify his retail food store, the Fleming Food Shoppe in Flint, Michigan, from participating in the federal Food Stamp program. The Court's subject matter jurisdiction rests upon provisions in the federal Food Stamp Act, 7 U.S.C.

§ 2011 *et seq.,* that authorize "de novo" judicial review of the validity of a decision to disqualify a store from participation in the Food Stamp program.  See 7 U.S.C. §§ 2023(a)(13), 2023(a)(15).

By motion filed on December 9, 2005, the Defendant United States of America now seeks an award of summary judgment in its favor on Plaintiff's challenge to the FNS's disqualification decision.[1]  In support of this motion, Defendant contends that the FNS had a sufficient basis for concluding that Plaintiff's store was engaged in food stamp trafficking, and that Plaintiff's efforts to explain away or cast doubt on the evidence in the administrative record do not suffice to raise a genuine issue of material fact as to the validity of the challenged decision.  In response, Plaintiff argues that the FNS's determination is open to question because of its reliance on data compiled through the agency's Electronic Benefit Transfer ("EBT") system, as opposed to local investigation or first-hand observation of illegal food stamp trafficking.

Having reviewed the parties' submissions, the accompanying exhibits, and the underlying administrative record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written materials, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Defendant's motion "on the briefs."  See Local Rule 7.1(e)(2), U.S. District Court,

---

[1] Although Plaintiff's complaint names a number of federal government officials and agencies as defendants, the United States is the only proper defendant in a suit challenging a disqualification decision.  See 7 U.S.C. § 2023(a)(13).  Accordingly, the Court will refer to the United States as the sole "Defendant" throughout the remainder of this opinion.

2

Eastern District of Michigan. This opinion and order sets forth the Court's rulings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Yacoub Hanna is the owner of the Fleming Food Shoppe in Flint, Michigan. On August 22, 2000, he secured the approval of the United States Department of Agriculture's Food and Nutrition Service ("FNS") to participate in the federal government's Food Stamp program.

As explained in Defendant's motion, the Food Stamp program no longer issues coupons, but instead provides recipients with an Electronic Benefit Transfer ("EBT") card that functions similarly to a bank-issued debit card. Each month, additional food stamp benefits are credited to a recipient's account, and these benefits are accessible through the recipient's EBT card. In particular, when a customer makes eligible purchases at a retail establishment that participates in the Food Stamp program, he swipes his EBT card through a card reader at the store, enters a PIN, and the amount of his transaction is electronically deducted from his food stamp benefit balance.

Because each such transaction now leaves an electronic "footprint," the FNS is able to compile these transaction records and examine the resulting data for indications that a retail food store might be violating the terms of the Food Stamp program. Based on such an analysis in this case, the agency notified Plaintiff in May of 2004 that he was suspected of such violations. Specifically, upon examining the records of EBT transactions at Plaintiff's store between October of 2003 and March of 2004, the FNS cited three categories of transactions that, in the agency's view, were suggestive of food

stamp trafficking: (i) an "inordinate number" of EBT transactions in exact-dollar amounts; (ii) a number of instances of a single food stamp recipient engaging in multiple transactions within a relatively short time period; and (iii) a number of large purchases that exceeded the average purchase amount for a store the size of Plaintiff's establishment. (See Admin. Record at 15-21.)

Upon receiving this notice of suspected food stamp trafficking, Plaintiff retained counsel and requested a meeting to explain the transactions cited by the FNS. On June 1, 2004, Plaintiff's attorney and his store manager, Chester Coburn, met with Jennifer Renegar, an investigator in the FNS's Grand Rapids, Michigan field office. At this meeting, Mr. Coburn explained that the even-dollar transactions cited by the FNS were attributable to Plaintiff's experimentation with a round-dollar pricing policy, which the store had abandoned in April of 2004 because "[i]t wasn't working." (Id. at 25.) With regard to the instances of multiple transactions from a single account within a short time period, Mr. Coburn speculated that customers might have been selling their food stamp benefits in the store's parking lot, but stated that he had no personal knowledge of this and could not "tell his customers what to buy." (Id.) Finally, Mr. Coburn sought to refute the suggestion that customers were making inordinately large purchases for a store the size of Plaintiff's, opining that the store sold more expensive food items that could account for these transactions.

Apart from these verbal responses from his store manager, Plaintiff also sought the

opportunity to provide additional records to refute the charge of food stamp trafficking. In particular, Plaintiff produced a number of invoices from his suppliers, which evidently were intended to demonstrate that the store's inventory was sufficiently large to account for the food stamp transactions cited by the FNS. Despite these submissions, and despite a visit to Plaintiff's store by FNS investigator Renegar that failed to uncover any first-hand evidence of food stamp trafficking, the FNS notified Plaintiff on June 9, 2004 that his store had been permanently disqualified from further participation in the Food Stamp program.

On June 11, 2004, Plaintiff requested administrative review of this adverse decision. In October of 2004, an administrative review officer affirmed the FNS's decision to permanently disqualify Plaintiff from participating in the Food Stamp program. This lawsuit followed in November of 2004, with Plaintiff challenging the validity of this administrative determination.

The record compiled in the administrative proceedings has been supplemented to only a limited extent during the course of discovery in this action. Although Defendant requested that Plaintiff produce all of his store's financial records for the period from October of 2003 through March of 2004, and although Plaintiff's store manager, Mr. Coburn, testified that the store's bookkeeper provides him with monthly statements of the store's sales, profits, and the like, (see Defendant's Motion, Ex. C, Coburn Dep. at 66-

68), no such records have been forthcoming.[2]  Instead, Plaintiff has produced essentially the same materials that he furnished during the administrative proceedings — namely, invoices reflecting the store's food purchases (as opposed to its sales) during the period at issue.

As discussed below, Defendant contends that these records confirm, rather than refute, the charge of food stamp trafficking, as they indicate that the food stamp redemptions at Plaintiff's store comprised an inordinate percentage of — and, in certain months, actually exceeded — the store's estimated overall sales of eligible food items during the relevant time period.  Indeed, if this food stamp data is considered along with the information Defendant has obtained from the State of Michigan regarding the store's redemptions under the state-administered Women, Infants and Children ("WIC") program, it appears that the store's redemptions under the Food Stamp and WIC programs combined significantly exceeded its food sales each and every month from October of 2003 to March of 2004.  As set forth in a summary provided by Defendant, Plaintiff's store sold less than $10,000 in eligible food items during this period, yet it redeemed over $63,000 in food stamps and WIC coupons.  (See Defendant's Motion, Ex. A.)

### III.  ANALYSIS

**A.     The Standards Governing Defendant's Motion**

Through its present motion, Defendant seeks summary judgment in its favor on

---

[2]Indeed, as Defendant points out, Mr. Coburn was not even able to recall the name of the store's bookkeeper.  (See id. at 27-28, 69.)

Plaintiff's challenge to the FNS's decision to disqualify Plaintiff's store from participating in the Food Stamp program. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The familiar principles governing the resolution of summary judgment motions are affected somewhat by the statutory provision governing challenges to FNS disqualification decisions. As noted earlier, this Court must conduct a "trial de novo" on Plaintiff's challenge here, "in which the court shall determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15). Unlike the more typical "substantial evidence" review of administrative determinations, this Food Stamp Act provision mandates that a district court "make its own findings based upon a preponderance of the evidence and not limit itself to matters considered in the administrative proceeding." Warren v. United States, 932 F.2d 582, 586 (6th Cir. 1991); see also Kahin v. United States, 101 F. Supp.2d 1299, 1302 (S.D. Cal. 2000).

Nonetheless, the courts have rejected the notion that "de novo" review under § 2023(a)(15) requires that a "district court proceed as if no agency action had been taken." Redmond v. United States, 507 F.2d 1007, 1011 (5th Cir. 1975). Rather, while the district court is not "bound by the administrative record," the agency's decision is presumed to be valid, and must stand "unless the plaintiff proves that it should be set

7

aside." Redmond, 507 F.2d at 1011-12; see also McCray v. United States, 511 F. Supp. 205, 209 (E.D. Mich. 1981). Thus, "[t]he burden of proof in the judicial review proceeding is upon the aggrieved store to establish the invalidity of the administrative action by a preponderance of the evidence." Warren, 932 F.2d at 586.

Juxtaposing this substantive standard with ordinary summary judgment principles, Plaintiff may withstand Defendant's motion by "rais[ing] material issues of fact as to each of the violations charged against" the Fleming Food Shoppe. Kahin, 101 F. Supp.2d at 1303. With these standards in mind, the Court turns to the record in this case.

**B.    Plaintiff Has Failed to Raise a Genuine Issue of Fact as to the Validity of the FNS's Decision to Disqualify His Store from Participation in the Food Stamp Program.**

Under the Food Stamp Act, a retail food store is subject to permanent disqualification from further participation in the Food Stamp program upon a determination that the store has engaged in "the purchase of coupons or trafficking in coupons or authorization cards." 7 U.S.C. § 2021(b)(3)(B). In the administrative decision now under review, the FNS determined that Plaintiff's store had engaged in food stamp trafficking by exchanging benefits for cash, and that Plaintiff had failed to establish a basis for the imposition of a fine in lieu of permanent disqualification. Through its present motion, Defendant argues that Plaintiff has failed to raise a genuine issue of material fact as to the validity of the grounds cited by the FNS in support of its decision. The Court agrees.

As discussed earlier, the FNS's finding of food stamp trafficking rested upon three

grounds. First, the agency cited a suspicious number of transactions in exact-dollar amounts. Next, the FNS pointed to a number of instances in which a single food stamp recipient engaged in multiple food stamp transactions within a brief period of time. Finally, the FNS opined that there were more large transactions at Plaintiff's establishment than would be expected for a store of its size. The Court addresses each of these grounds in turn.

In its initial May 19, 2004 notice to Plaintiff of suspected violations of the Food Stamp program, the FNS identified 39 exact-dollar transactions at Plaintiff's store between October 2, 2003 and February 13, 2004. (See Admin. Record at 17.) In response, Plaintiff's store manager, Chester Coburn, stated at a meeting with an FNS investigator that the store had been experimenting during this time period with an exact-dollar pricing scheme "like a Dollar Store," but that this pricing method was abandoned in April of 2004 because "[i]t wasn't working." (Id. at 25.) Similarly, in his response to Defendant's summary judgment motion, Plaintiff asserts, without citation to the record, that he informed the FNS during its investigation "that [his store] had implemented an even dollar pricing [scheme], which did not prove to be profitable for the store." (Plaintiff's Response Br. at 4.)[3]

---

[3]Notably, Plaintiff's response to Defendant's motion is replete with statements which, like this one, are utterly unsupported by any citation to the record. Indeed, the ***only*** such citations that appear ***anywhere*** in Plaintiff's brief are references to the deposition testimony of FNS investigator Jennifer Renegar. Unfortunately, Plaintiff did not attach a transcript of this deposition (or any other exhibits) to his response brief, and this transcript has not otherwise been made a part of the record provided to the Court. It is a difficult task, to say the least, for Plaintiff to identify genuine issues of material fact without citing ***any*** record evidence that might give rise

9

As noted by Defendant, Plaintiff's explanation on this point is somewhat wanting, to say the least. First, out of the 39 exact-dollar transactions identified by the FNS, 26 were multiple-of-five transactions — *i.e.,* for amounts of $10.00, $15.00, $20.00, $25.00, or $30.00. (See Admin. Record at 17.) An even-dollar pricing scheme alone would not account for this disproportionate number of multiple-of-five transactions. In addition, Defendant points to the evidence that the same customers were responsible for a significant portion of these exact-dollar transactions. A single food stamp recipient, for example, redeemed (i) $30.00 in food stamps three times, on October 7, October 9, and December 5, 2003, (ii) $25.00 in benefits on October 13 and 17, 2003, and then again on February 5, 2004; and (iii) exact-dollar amounts of food stamps on six other occasions during the relevant period. (See id.) Plaintiff's appeal to a purported round-dollar pricing scheme simply does not account for these additional indicia of food stamp trafficking — particularly where, as discussed below, a ***second*** category of suspicious transactions tends to belie Plaintiff's claim of exact-dollar pricing during the relevant time period.

The FNS's disqualification decision also was based on a number of instances of three or more transactions by the same food stamp recipient within a very short time frame — 48 hours at most, and sometimes all within a single day. One recipient, for example, engaged in ten (10) transactions in less than 48 hours between March 18 and March 20, 2004, with the last two of these transactions occurring within 10 minutes of

---

to such issues.

each other and involving *precisely the same amount, $29.99.*  (See id. at 18.)  As Defendant points out, apart from the threshold implausibility of a single customer making several separate purchases within a brief time span — which, according to the record, occurred with ten different customers between October of 2003 and March of 2004, (see id. at 18-19) —  there are multiple instances in the record of a single recipient making two purchases within a few minutes *in exactly the same amount.*  In one instance, this was an exact-dollar amount ($25.00), but the remaining duplicate transactions were in amounts ending in 99 cents — figures which, of course, are flatly inconsistent with Plaintiff's claim of an exact-dollar pricing scheme during this same period.

Plaintiff's explanation for this category of suspicious transactions — supplied by his store manager during a meeting with FNS investigator Jennifer Renegar, but not otherwise supported by any affidavit or sworn testimony from Plaintiff himself — is that his customers likely were selling their food stamp benefits in the store's parking lot, resulting in a single EBT card being used by multiple customers in a short time frame.  Indeed, Plaintiff views Ms. Renegar's deposition testimony as lending support to this theory, as she evidently stated that, upon her arrival at Plaintiff's store to investigate possible food stamp trafficking, she observed a number of people in the store's parking lot immediately begin to disperse.[4]  As Defendant points out, however, Plaintiff's

---

[4]As noted earlier, the Court is forced to rely on the representations of Plaintiff's counsel regarding Ms. Renegar's deposition testimony, as a transcript of this testimony has not been provided for the Court's review.

explanation for the documented instances of multiple transactions on a single EBT card within a short time frame does not account for the occasions where two successive purchases under the same account involved the same amount *to the penny.* Once again, then, Plaintiff's proffered explanation appears implausible.

Yet, even if Plaintiff could be said to have identified genuine issues of fact with regard to the first two categories of suspicious transactions cited by the FNS — a task which, as noted, has been made considerably more difficult through Plaintiff's utter failure to cite any supporting evidence in the record — he has not mounted any sort of tenable challenge whatsoever to the agency's finding that his store's food stamp redemptions comprised a disproportionate share of the store's overall sales of eligible food items during the relevant period. In particular, using Plaintiff's own records (such as they are), Defendant has shown that the store's total food stamp redemptions for the period from October of 2003 to March of 2004 ($11,453.72) actually *exceeded* the store's total sales of eligible food items ($9,356.93). (See Defendant's Motion, Ex. A.)[5] Similarly, Defendant's computations have revealed that the store's monthly food stamp redemptions exceeded its sales of eligible food items in three of the six months during this period. (See id.) Moreover, if one were to combine the store's redemptions under the

---

[5]Because Plaintiff failed to produce any sales records for this period, but instead produced only invoices for purchases of stock from the store's suppliers, Defendant has been forced to estimate the relevant sales figures. Defendant did so by totaling up the amounts in the invoices and then applying a 40-percent mark-up, as opposed to the 32-percent mark-up to which store manager Chester Coburn testified at his deposition. Presumably, then, Defendant's estimates have slightly overstated the store's actual sales, and Plaintiff does not suggest otherwise in his response to Defendant's motion.

federal Food Stamp program and Michigan's WIC program, these redemptions ($63,676.32) exceeded the store's total sales of eligible food items ($9,356.93) by ***more than a factor of six*** during the period from October of 2003 to March of 2004. (See id.)

Plaintiff has failed to raise any issue of material fact as to the validity of these findings. Beyond his vague, unsupported, and largely immaterial assertions about the sorts of customers who frequent his store, (see, e.g., Plaintiff's Response Br. at 4-5 (characterizing the area around Plaintiff's store as "low income and made up of predominantly single households")), Plaintiff suggests only that Defendant's computations are flawed because its estimated sales figures for Plaintiff's store do not include certain "meat bundles" that it occasionally sells to its customers. Yet, leaving aside the fact that Plaintiff evidently did not produce any documentation concerning these "meat bundles" until well after the close of discovery[6] — an untimely production that presumably was motivated by Plaintiff's discovery that the invoices he had previously furnished could not possibly support his store's food stamp and WIC redemptions — Defendant correctly points out that these meat sales do not begin to close the sizable gap between Plaintiff's food stamp and WIC redemptions and his store's total sales of eligible items during the relevant six-month period.

The first clue that these invoices for meat purchases might not do much to

---

[6]The discovery cut-off date in this case was June 30, 2005, but Plaintiff apparently did not provide invoices for these meat purchases until September 22, 2005. (See Defendant's Reply Br., Ex. B.)

undermine the FNS's findings is that Plaintiff himself makes no effort in his response to Defendant's motion to actually *show* how they would do so — nor, indeed, to even *provide* any such invoices as exhibits to his response.  Rather, true to form, Plaintiff merely asserts, without citation to the record or any supporting figures, that these invoices "support that [his store's] inventory is large enough to support the large food stamp transactions." (Plaintiff's Response Br. at 3.)  In any event, upon undertaking the task that Plaintiff should have performed, the Court has determined that these meat purchases add roughly $1,000 per month to the amount Plaintiff spent during the relevant period to stock his store with eligible food items.  Applying the same 40-percent mark-up that Defendant used to derive its estimate of Plaintiff's sales, these meat purchases would increase Plaintiff's total estimated sales for the relevant period to roughly $17,600, rather than roughly $9,356.93.  Even so, the food stamp redemptions of over $11,400 during this period would still reflect nearly 65 percent of Plaintiff's overall sales — and, of course, these sales of approximately $17,600 still would not even come close to accounting for the *$63,676.32* in combined food stamp and WIC redemptions during this period.  Accordingly, Plaintiff's eleventh-hour attempt to boost his sales figures does not cast any genuine doubt upon Defendant's compelling evidence of food stamp trafficking.

     Finally, beyond his various "explanations" — which, as noted, are based largely upon rank speculation and his counsel's bare assertions, and which generally fail to account for the anomalies revealed in the FNS's investigation — Plaintiff advances a more general objection that the FNS impermissibly based its decision on an analysis of

14

EBT transaction records rather than first-hand observation of wrongdoing.  As Defendant points out, however, the Food Stamp Act expressly allows disqualification decisions to be based upon "evidence obtained through a transaction report under an electronic benefit transfer system."  7 U.S.C. § 2021(a); see also 7 C.F.R. § 278.6(a).  Accordingly, the courts have upheld disqualification decisions based on analyses of EBT data comparable to that which the FNS performed in this case.  See, e.g., Idias v. United States, 359 F.3d 695, 698 (4th Cir. 2004); McClain's Market v. United States, 411 F. Supp.2d 772, 776-77 (N.D. Ohio 2005), aff'd, 2006 WL 3780304 (6th Cir. Dec. 20, 2006); Kahin, supra, 101 F. Supp.2d at 1303-04.  There simply is no requirement under the Food Stamp Act that a store be "caught 'red-handed' engaging in food stamp or EBT card fraud" before it may be disqualified from participating in the Food Stamp program.  Kahin, 101 F. Supp.2d at 1303.  Rather, circumstantial evidence may suffice, and the evidence here strongly supports the FNS's determination that Plaintiff's store had engaged in food stamp trafficking.

### IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's December 9, 2005 motion for summary judgment is GRANTED.

                                                         s/Gerald E. Rosen
                                                         Gerald E. Rosen

                                    United States District Judge

Dated: March 30, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 30, 2007, by electronic and/or ordinary mail.

                                    s/LaShawn R. Saulsberry
                                    Case Manager